# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

## INTRODUCTION

I, Jason O'Brien, of the Cincinnati Police Department, a Task Force Officer assigned to the Federal Bureau of Investigations' Safe Streets Task Force in Cincinnati, Ohio, being duly sworn, state:

1. I am an investigative or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), empowered to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. I am a Task Force Officer with the Federal Bureau of Investigation (FBI), and have been so employed since September 2011. I am also a Cincinnati Police Officer and have been since August 2002. I have conducted investigations into criminal enterprises, narcotics investigations, organized crime, and violent crimes to include the unlawful possession, possession with the intent to distribute, and actual distribution of controlled substances, as well as the associated conspiracies in violation of Title 21, United States Code, Sections 841(a)(1) and 846. I have also participated in the execution of federal search warrants and federal arrest warrants in relation to these investigations. Additionally, I have participated in the installation and monitoring of tracking devices for vehicles in order to determine the whereabouts of believed drug traffickers and their illicit merchandise. I have also been involved with the analysis of pen registers and monitoring Title III Wire intercepts related to narcotics investigations.

3. During the course of my law enforcement career, I have conducted and participated in the investigation of numerous criminal offenses, including those involved in the current investigation. I have participated in numerous illicit drug trafficking investigations, violent

1

crimes investigations, and gang/criminal enterprise investigations, ranging from street level dealers to major drug suppliers and violent street gangs operating in Southwest Ohio. Those investigations have also included the unlawful importation, possession with intent to distribute and distribution of illegal substances, the related money laundering instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses. The investigations during my career - which have resulted in the seizure of narcotics, arrests of suspects, their prosecution, and conviction - have involved the use of confidential informants, the analysis of pen registers, trap and trace, toll records, physical surveillances, electronic surveillances to include the use of pole cameras and vehicle cameras, and the execution of search warrants. I have also been the affiant on several search warrant affidavits, have testified in grand jury proceedings, and have written reports and analyzed documents in the course of investigations.

4. I am familiar with the paranoia surrounding most drug traffickers and the common ways in which wholesale drug distributors attempt to conceal their assets, their purchases, and other financial dealings that could be traced to them. I am also familiar with methods of concealing the whereabouts of their illegal drugs, the methods they use to keep law enforcement officers from finding evidence of drug trafficking operations as well as the methods they use to prevent others unfamiliar with their criminal conduct from observing things indicative of drug trafficking.

5. I have been involved in numerous post-arrest interviews of individuals, interviewed defendants in conjunction with post-arrest proffers, interviewed confidential informants and other non-defendant individuals with knowledge of illegal drug trafficking. During such interviews and discussions with other experienced agents, I have become familiar with the day-to-day

operations of distributors and transporters of controlled substances. I have gained knowledge regarding the various methods, techniques, codes, and/or jargon used by illegal drug traffickers in the course of their criminal activities. These tactics include the use of firearms to protect their narcotics related activities, violence to maintain drug territories, and the use of several separate mobile devices and/or cellular telephones to facilitate communications (these devices are often subscribed to with the use of fictitious names and addresses to avoid detection by law enforcement).

6. I have had the opportunity to monitor, listen to, and review transcripts, line sheets or monitor's logs pertaining to intercepted communications involving the trafficking of marijuana, cocaine, and heroin by persons who employed some form of code meant to thwart law enforcement. I have also debriefed, spoken with, or interviewed numerous people through proffer interviews that were convicted of drug trafficking offenses that utilized speaking coded conversations over the telephone.

7. As a result of my participation in these, and other investigations, I have gained particular knowledge in the use of confidential informants, physical surveillance, consensual recordings, investigative interviews, mail covers, garbage searches, GPS tracking devices, pole-mounted cameras, grand jury subpoenas and federal and state search warrants. In addition to using these investigative techniques, I have been required to analyze information resulting from traditional record sources, such as pen register and trap and trace devices, financial records, utility records, and telephone toll and subscriber records. I have also gained experience in the identification and collection of drug and non-drug evidence.

8. By virtue of my training and experience, through my conversations with and review of reports from other experienced agents and officers who conduct drug investigations, violent crime

investigations, and gang and criminal enterprise investigations, I have become familiar with the methods used by drug traffickers to import, collect, transport, store, safeguard, remit and/or launder drug proceeds; the methods used by drug traffickers to obtain and utilize multiple telephones, computers, and other devices in order to communicate with each other; and the jargon and/or codes commonly used when they refer to drugs and/or drug proceeds. As a result of my experience, I have become familiar with the day-to-day operations and the various tools, methods, trends, paraphernalia and related articles used by various traffickers in their efforts to manufacture, possess, import, conceal, package, use and distribute controlled substances.

9. I have also had discussions with other law enforcement officers and other cooperating individuals about the packaging and preparation of narcotics, methods of operations, and security measures which are often employed by narcotics traffickers. Through these investigations, I have gained expertise in the use of a variety of law enforcement techniques, the utilization of confidential informants, the use of physical surveillance techniques, and various other types of electronic surveillance techniques to include body wires and transmitters. Additionally, I have gained knowledge and expertise in the utilization of pen register and trap and trace devices, telephone toll analysis, the analysis of traditional types of records, including financial records, telephone records and utility records. I have also gained knowledge and expertise in the collection and identification of drug evidence and the analysis and interpretation of taped conversations obtained by the methods detailed above.

10. I have participated in the investigation of the offenses referred to below, and have reviewed FBI reports and reports prepared by other law enforcement agencies. I have been involved in this investigation and related investigations since 2016. I am familiar with the facts and circumstances described herein. Since this affidavit is being submitted for the limited purpose

4

of obtaining a search warrant for 11791 Tennyson Dr. Cincinnati, Ohio 45241 (as further described in Attachment B), I have not included each and every fact in this investigation of which I am aware.

11. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

    a. Oral and written reports about this and other investigations which I have received from members of FBI, local law enforcement agencies, and other Federal agencies;

    b. Physical surveillance conducted by FBI, other federal agents, and local law enforcement agencies, which have been reported to me either directly or indirectly; and

    c. Multiple bulk cash pickups from ANDERSON.

## Probable Cause

12. FBI-Cincinnati and FBI-San Diego have been investigating a money laundering and drug trafficking organization based out of Culiacan, Sinaloa, Mexico, with links to Cincinnati, Ohio and elsewhere in the United States. Jose Roberto Lopez Albarran (hereinafter Albarran), Michael Wayne ANDERSON and Jose Ignacio Avendano (hereinafter Avandano) were identified as participants in the criminal organization. In this investigation, the FBI used multiple confidential sources and multiple undercover agents to participate in multiple controlled money "pickups" in cities across the Unites States, following a common pattern. Subsequently, the FBI - using undercover agents who represented themselves as the managers and/or employees of a money laundering organization - offered services to Albarran in the pickup and laundering of bulk cash narcotics proceeds. Albarran stated in conversations with undercover agents that the source of the bulk cash for which he brokers pickups is through the sale of illicit narcotics.

5

13. Investigators identified Jose Avendano as the manager of a regional narcotics distribution network, with known distribution hubs in Cincinnati, Ohio and Detroit, Michigan. Through a combination of prior T-III wore intercepts, recorded phone calls conducted by undercover agents, physical surveillance and interviews, investigators identified Avendano and ANDERSON as working together to distribute narcotics in the Cincinnati, Ohio, area and to consolidate bulk cash proceeds from the sales of narcotics for the purpose of sending it to Mexico to be "laundered." Undercover agents representing themselves as a San Diego-based money laundering organization picked up bulk cash narcotics proceeds from Jose Avendano and Michael ANDERSON on multiple occasions. Based on these bulk cask pickups, bulk cash seizures, as well as CHS reporting, investigators believe Avendano and ANDERSON sent approximately $1.3 million dollars to their Mexican narcotics suppliers, and law enforcement seized approximately $200,000.

14. During the investigation, investigators developed a cooperating defendant (hereinafter CD1). CD1 has: agreed to testify; provided information in the past for case consideration; and provided significant amounts of information in the past which has been proven to be true and accurate concerning various individuals and their patterns of criminal behavior. CD1 previously provided information - which law enforcement officers have vetted as reliable - concerning drug trafficking offenses. Consequently, agents believe CD1 to be a reliable source of information concerning this investigation.

15. CD1 had direct knowledge of ANDERSON's money laundering and drug trafficking operation. CD1 provided that ANDERSON is a kilogram-scale narcotics trafficker and a large-scale money launderer. CD1 stated that Anderson routinely purchased multiple kilograms of narcotics from the Sinaloa Cartel. CD1 also stated that ANDERSON sent large amounts of

bulk cash to the cartel as payment for those narcotics. CD1 stated that ANDERSON routinely stores large amounts of narcotics and currency hidden in his residences.

16. On September 25, 2017, Jonae Tye, ANDERSON's longtime girlfriend, reported to police that four men carrying guns and wearing masks conducted a home invasion Robbery and Kidnapping at their residence at the time at 989 Kemper Meadow Drive. Tye was present with her three female juvenile children along with Tye and ANDERSON's 15 month-old child. Tye stated to Police that the four men with guns forced their way into the residence demanding money. The four men searched the residence looking for money. The four men removed $2000 from Tye's purse, Tye's cell phone and an additional $400. They repeatedly asked about the whereabouts of additional money. As the four men were leaving the residence, one of the men grabbed the 15 month-old child in a car seat. As they were leaving Tye's child, one of the men stated "have your boyfriend give me a call" (ANDERSON). The four men left with the child in a white Ford Explorer. Later law enforcement located the Ford Explorer and attempted to stop it. The driver of the vehicle refused to stop. After a vehicle pursuit, the four men fled from the vehicle leaving the child inside. Multiple suspects were arrested and charged for the offense. Investigators believe the suspects were looking for large amount of currency that was stored in ANDERSON and Tye's residence. CD1 reported to investigators that ANDERSON told CD1 that he (ANDERSON) had approximately $100,000 hidden in the walls of his residence at the time of the Robbery, not found by the suspects. CD1 and Agents believe that cash to have been proceeds from illicit narcotics trafficking.

17. On September 9, 2019, FBI-Cincinnati observed ANDERSON driving a silver Infiniti SUV bearing Ohio dealer license plate 006-A1II, registered to Elite Auto Sales. ANDERSON was observed pulling into Auto Lounge at 80 Novner Drive, Cincinnati, Ohio. According to the

Ohio Secretary of State, Auto Lounge is incorporated by Jonae Tye, Finnis Bonner and Michael ANDERSON.

18. On September 25, 2019, in the above-described investigation, Michael ANDERSON was charged in United States District Court in the Southern District of California in a criminal complaint, alleging violations of Title 18 U.S.C. 1956(a)(2)(A) (Conspiracy to Launder Monetary Instruments through International Promotion) and Title 18 U.S.C. 1956(a)(B)(i) and 1956(h) (Conspiracy to Launder Monetary Instruments through International Concealment), in case number 19MJ4155.

19. On September 25, 2019, the same silver Infiniti SUV as described above was observed parked in the driveway of 11791 Tennyson Drive, Cincinnati, Ohio 45241 (hereinafter TARGET RESIDENCE) but on this occasion the Infiniti was bearing Ohio dealer license plate 001-A4RG. Also in the driveway of the TARGET RESIDENCE was a white Acura bearing Ohio dealer plate 003-8959 and registered to Mid-City Automotive. According to the Ohio Secretary of State Mid-City Automotive is incorporated by Jonae Tye, however investigators have learned during this investigation that Mid-City Automotive is operated by ANDERSON.

20. On September 30, 2019, the same silver Infiniti SUV as described above (bearing Ohio dealer license plate 001-A4RG) was parked on the street in front of the TARGET RESIDENCE. Also parked in front of the TARGET RESIDENCE was a black Ford Taurus registered to Dewitt Anderson. Dewitt Anderson is believed to be a family member of Michael ANDERSON. At approximately 9:00 AM, a male black subject (who investigators believe to be ANDERSON) was observed exiting the TARGET RESIDENCE and entering the above-described Infiniti SUV. The Infiniti was followed to Springdale Elementary School where surveillance was lost after the vehicle pulled into the student drop off line. Based on my training, experience and

8

what I have learned during the course of the investigation, I believe that ANDERSON left the TARGET RESIDENCE with his daughter and took her to school at Springdale Elementary.

21. Further, on August 19, 2019, Jonae Tye posted a photo on her publically available Facebook page of Tye and ANDERSON's daughter in front of what investigators believe is the same garage doors of the TARGET RESIDENCE.

22. Accordingly, based on my training, experience and what I have learned during the course of the investigation I believe that ANDERSON is residing within the TARGET RESIDENCE. Furthermore, I believe it is likely that ANDERSON is storing evidence of his illegal drug trafficking and money laundering organization in the TARGET RESIDENCE. This belief is based on what I have learned during the course of the investigation: ANDERSON routinely changes his telephone; ANDERSON also has operated multiple vehicles with multiple license plates (usually some variant of a Dealer Temporary Tag)[1]; and on CD1's reporting about ANDERSON wherein CD1 stated that ANDERSON routinely hides large amounts of narcotics and currency in his residence.

23. The Michael ANDERSON DTO is a very complex organization that sells narcotics, utilizes multiple locations; as well as close family and friends to hide, transfer and sell assets and drug proceeds through multiple states and other drug trafficking organizations to avoid law enforcement detection and prosecution.

24. Based upon my training and experience, large narcotics traffickers maintain, on hand, significant amounts of $U.S. currency in order to maintain and finance their ongoing narcotics activities and other businesses, as well as for paying bills, acquiring assets, and making

---

[1] Based on my experience and training, I believe this to be indicative of an individual who is trying to evade law enforcement, common among individuals involved in drug trafficking organizations.

9

purchases. It is common for large scale drug dealers to conceal contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residence for ready access and concealment from law enforcement.

25. Individuals engaged in large scale drug trafficking conceal items within their residences and business locations, caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of the drugs transactions; and evidence of the financial transactions related to obtaining, transferring, secreting, and spending large sums of money made from narcotics trafficking activities. It is common for large scale drug dealers to secure "stash houses," that is, premises other than their personal residence, maintained by themselves or others, for the purpose of storing narcotics, records of drug transactions, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions; and evidence of financial transactions relating to obtaining, transferring, or spending of large sums of money made from engaging in narcotics trafficking activities. When drug traffickers amass large amounts of proceeds from the sale of drugs, the drug traffickers attempt to make these profits appear to be legitimate, that is, to accomplish these goals, drug traffickers utilize, including, but not limited to; foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts, and that even if off-site locations are used to store the above listed records, some evidence of such, such as safety deposit box keys, records, and receipts from storage lockers and mini-warehouses.  Drug Traffickers often take or cause to be taken photographs of themselves, their associates, property, proceeds, and products; and usually maintain photographs and videos of such evidence.

26. Members of such DTOs utilize different individuals and multiple locations to conceal evidence of the DTO from law enforcement. Your affiant submits that there is probable cause to find that a search of the above premises under the conditions set forth herein is reasonably likely to results in the recovery of the evidence described above. Your Affiant knows through his training and experience that drug traffickers often conceal illegal drugs and drug proceeds and records of illegal drug transactions along with other evidence and fruits of criminal activity at various locations on their property, including outbuildings and vehicles.

27. The facts in this affidavit come from my personal observations, training, and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

28. ANDERSON is a fugitive with an active federal Arrest Warrant. Accordingly, he is a person to be arrested as provided in Federal Rule of Criminal Procedure 41.

29. Based on the aforementioned facts set forth in the affidavit, your affiant believes that inasmuch as a neutral and detached judge determined there is probable cause to believe that Michael ANDERSON and others have violated Title 18 U.S.C. 1956(a)(2)(A) (Conspiracy to Launder Monetary Instruments through International Promotion) and Title 18 U.S.C. 1956(a)(B)(i) and 1956(h) (Conspiracy to Launder Monetary Instruments through International Concealment); and that ANDERSON remains involved in narcotics trafficking and money laundering, that it is therefore likely that ANDERSON is using 11791 Tennyson Drive, Cincinnati, Ohio 45241, to store/conceal, bulk cash, narcotics, scales, packaging material, processing paraphernalia, ledgers, and other instrumentalities of drug trafficking, as well as items connected with bulk cash smuggling and/or money laundering. By searching the aforementioned location your

affiant submits that it is likely FBI will find further proof of the organization's illegal activities and may seize additional contraband and/or fruits of illegal activities.

30. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant and the attachments, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is probable cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

31. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the search authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the property owner/user/occupant would seriously jeopardize the ongoing investigation, as such a disclosure would give that person and others an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1).

Respectfully submitted,

_____
Jason M. O'Brien
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me on this ___30th___ day of ___September___, 2019.
Via electronic means, specifically FaceTime.

*Stephanie K. Bowman*
_____
HONORABLE STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

Search warrant for: residence at 11791 Tennyson Drive, Cincinnati, Ohio 45241, any detached buildings of the subject property, Michael Anderson's silver Infiniti SUV bearing Ohio Dealer Tag 001 A4RG.

The target building is a two story, single-family dwelling, located on the north side of Tennyson Drive. The front door faces south onto Tennyson Drive. The residence mostly consists of a red in color brick, with beige garage doors, and a dark in color front door. The residence has beige trim with a distinct beige siding section over the front door. There is a sidewalk to the front of the residence.



**ATTACHMENT B**

<u>THE ITEMS TO BE SEIZED</u>:

The items to be seized are evidence of drug money laundering violations related to Title 18, United States Code, Sections 1956, specifically:

a. Narcotics or money ledgers, customer lists of narcotics distribution, narcotic supplier lists, correspondence, notations, logs, receipts, journals, books, records and other documents (including computer disks) noting the price, quantity, and/or times when narcotics were obtained, transferred, sold, distributed, and/or concealed;

b. Cash derived from the sale of controlled substances;

c. Any and all controlled substances;

d. Books, records, receipts, computer storage media, electronic information storage devices, bank statements and records, wire transfer records, money drafts, letters of credit, money order and cashier's check receipts, passbooks, bank checks, accounting of expenditures made and payments received, safe deposit box keys and records, money wrappers, rubber bands, money containers, safes, financial records, and notes showing payments, receipt, concealment, transfer, or movement of assets generated from the sale of narcotics;

e. Cellular telephones, beepers, personal telephone and address books, listings, letters, cables, telegrams, telephone bills, including cellular telephone and beeper bills, fax messages, fax logs, telephone message records, telephone electronic storage devices, personal notes, photographs, calendars, diaries and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking and money laundering activities;

f. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including traveler's checks, bonds, stock certificates, cashier's checks, money orders, and certificates of deposit; money counting machines; money wrappers, boxes, bags, briefcases, suitcases or containers used to carry currency or controlled substances;

g. Records, documents and deeds reflecting the purchase or lease of real estate, any vehicles, or other items, obtained with the proceeds of the sales of controlled substances;

h. Records, items and documents reflecting travel for the purpose of participating in narcotics trafficking, including passports, airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to locations;

i. Photographs and electronic images, such as video recordings and tape recordings which document the association with other co-conspirators;

j. Firearms, ammunition, and firearm magazines.